Omar BLANCO, Petitioner–Appellee,
Cross–Appellant,

v.

Harry K. SINGLETARY, as Secretary,
Department of Corrections, State of
Florida, Respondent–Appellant, Cross–
Appellee.

No. 88–5758.

United States Court of Appeals,
Eleventh Circuit.

Sept. 30, 1991.

Carolyn V. McCann, State Attorney's Office, Fort Lauderdale, Fla., for respondent-appellant, cross-appellee.

Larry H. Spalding, Billy H. Nolas, Tom Dunn, Capital Collateral Representative, Tallahassee, Fla., for petitioner-appellee, cross-appellant.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

The state of Florida appeals the district court's grant of habeas relief to petitioner-appellee/cross-appellant Omar Blanco as to the sentencing phase of his death penalty trial. Blanco cross-appeals the district court's refusal to grant habeas relief as to the guilt/innocence phase of his trial. We affirm.

I. CIRCUMSTANCES OF THE CRIME

Blanco was sentenced to death for murder in Florida in 1982. The circumstances of the crime are set out in the Florida

Supreme Court's opinion on direct appeal, which we quote in relevant part:

Fourteen-year-old Thalia Vezos testified that at approximately 11 p.m. on January 14, 1982, she was in her bed reading at her home in Ft. Lauderdale when she saw a man standing in the hallway holding a gun and carrying a brown wallet-type object under his arm. The intruder indicated that Thalia was to keep quiet. He then cut the wires to her telephone and left the room. Thalia's uncle, John Ryan, appeared in the hall and tried to take the gun from the intruder. Ryan was shot in the scuffle and landed on top of his niece on the bed. The intruder shot Ryan six more times. The intruder then fled. Thalia ran next door to the home of the Wengatzes, where the police were called.

The police arrived at the crime scene at 11:14 p.m. Officer Bull went next door and spoke to Thalia, who described the intruder as a Latin male, between 5'8" to 5'10", 180 to 190 pounds, wearing a gray or light green jogging suit, with dark curly hair. Officer Bull sent the description to a dispatcher at approximately 11:24 p.m. A man who lived across the street, George Abdeni, came forward with a report that he had heard shots and screaming and had seen the profile of a person in a gray jogging suit heading east from the Vezos property. This information was contained in a police BOLO that included the fact that the suspect was proceeding eastward.

The BOLO as dispatched described the suspect as a Latin male about 5'10" in height with dark complexion, black curly hair, some kind of mustache, wearing a gray or light green jogging suit, and running in an eastwardly direction. Officer Price, who was in the area, positioned his car approximately one and a half miles from the scene in a driving lane facing east on 30th Street next to North A1A to watch for someone fitting the BOLO description. At approximately 11:57 p.m. he saw appellant riding a white bicycle on the sidewalk southbound on A1A and determined that appellant fit the description on the BOLO except for his pants, which at first appeared to be heavy corduroy. He also had full facial hair. Officer Price requested more information. He then followed appellant for approximately one-tenth of a mile before stopping him. The first thing the officer noticed when he got within three to four yards of appellant was that the gray pants were the same material as the top of the sweatsuit. Officer Price requested a backup unit. He asked appellant if he possessed a gun. Appellant replied, "No Ingles." The officer frisked appellant, but found nothing but a necklace and watch which appellant was wearing. When the backup unit arrived, the officers handcuffed appellant and took him to the murder scene. Mr. Abdeni identified appellant as having the same profile and jogging suit as the figure he had seen earlier. Appellant was then formally arrested.

A man's purse containing appellant's ID papers and a watch belonging to Thalia Vezos was found near the door to Thalia's bedroom.

On the day following the murder, Thalia Vezos identified appellant in a line-up as the perpetrator. The Broward County Grand Jury indicted appellant on February 2, 1982, for first-degree premeditated murder and for armed burglary. Trial began on June 1, 1982, and the jury found appellant guilty on both counts. In compliance with the jury's recommended verdict, the trial judge sentenced appellant to death for the murder. He was sentenced to 75 years for the armed burglary.[1]

One additional piece of evidence linked Blanco to the crime: The state introduced evidence that Blanco's hands were covered with gunpowder residue at the time of his arrest, which was consistent with Blanco having recently fired a weapon.[2]

---

1. *Blanco v. State*, 452 So.2d 520, 522–23 (Fla. 1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985).

2. Trial transcript at 1241.

## II. PROCEDURAL HISTORY

The Florida Supreme Court affirmed Blanco's conviction and sentence.[3] The Florida courts also denied Blanco's petitions for post-conviction relief and for habeas corpus relief.[4]

Blanco petitioned for a writ of habeas corpus in the district court, raising fifteen claims. The district court granted Blanco a new sentencing hearing because it determined that: (1) Blanco's trial counsel were ineffective during the sentencing phase because they allowed the trial court improperly to interrogate Blanco and because they revealed negative information about Blanco in response to the trial court's inquiries; (2) counsel were ineffective during sentencing because they revealed the defense strategy; and (3) the trial court improperly diminished the jury's sense of responsibility in the Florida death penalty sentencing process.[5]

We will first address the state's and Blanco's contentions that the district court erred in analyzing the facts and law surrounding the principal issue in this appeal. This unique issue simultaneously pertains to the trial court's interference with the conduct of Blanco's defense, defense counsels' ineffectiveness in response to the trial court's interference, and defense counsels' failure to present any mitigating evidence during sentencing. We will then proceed to address the state's argument that the district court erred in granting Blanco an evidentiary hearing, as well as Blanco's other arguments that the district court should have granted relief as to the guilt phase of his trial. Because we find that the district court correctly granted Blanco a new sentencing trial due to the ineffectiveness of Blanco's counsel, we do not address any other issues relating to sentencing.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Several of Blanco's fifteen claims before the district court related to the alleged ineffectiveness of his trial counsel resulting from the actions of the trial court in questioning him, in directing his attorneys to call witnesses, and in generally controlling the conduct of the defense during portions of the guilt and sentencing phases of the trial.[6] The facts underlying these claims are lengthy and complex but are necessary to a complete understanding of the interwoven issues they entail.

### A. Facts

The defense theory expressed in the opening statement was simple: Thalia Vezos was mistaken, the purse was planted by some mystery killer, and Blanco had lost his purse (which contained his identification) at least a week before the offense. After presenting two defense witnesses who testified that Blanco had lost his purse shortly before the murder, defense counsel informed the court that two other witnesses (Romero and Gonzalez) would not be called on this issue and that Blanco disagreed with the decision not to call the two witnesses. Attorney Tenbrook informed the court:

> I explained to him, or tried to explain to him through Mr. Rodriguez and the interpreter that as far as any witnesses—of course, with the exception of the defendant—it's up to the defense counsel to decide which witnesses to call and which witnesses not to call; that in my

---

3. *See Blanco v. State,* 452 So.2d at 520.

4. *See Blanco v. Wainwright,* 507 So.2d 1377 (Fla.1987).

5. *See Blanco v. Dugger,* 691 F.Supp. 308 (S.D.Fla.1988).

6. The district court grouped these four claims under the heading of ineffective assistance of counsel. *Blanco v. Dugger,* 691 F.Supp. at 322. The district court styled these claims as follows:

"CLAIM XI: INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING"; "CLAIM XII: TRIAL COURT'S DIRECTIONS TO BLANCO'S COUNSEL REGARDING PRESENTATION OF DEFENSE CASE"; "CLAIM XIII: TRIAL COURT'S INTERROGATION OF BLANCO AND CONCURRENT FAILURE TO WARN THAT ANSWERS ELICITED COULD BE USED IN SENTENCING AND INEFFECTIVENESS OF TRIAL COUNSEL FOR FAILING TO OBJECT"; "CLAIM XIV: TRIAL COUNSELS' DISCLOSURE OF DEFENSE STRATEGY TO COURT." *Id.* at 325–331.

mind that is a tactical decision, and I don't have my clients telling me who to call and who not to call, with of course the exception of themselves they have an absolute right to make that decision.

He's asked me to bring this to your attention. I'm not quite sure why, but I'm bringing it to your attention at this time.

I'm not going to call them as long as I'm the attorney trying this case, and apparently there is a disagreement about that.[7]

The trial court thought the disputed testimony should be proffered so Blanco "can't raise it at a later time and indicate you were incompetent counsel for not calling these people...."[8]

The court asked counsel if further discussion with Blanco might be fruitful. Tenbrook responded: "Considering I can't talk directly with him, it's hard."[9] Rather than resolving the issue immediately, the trial judge told defense counsel to call other witnesses while the pertinent question was mulled over. The judge's preliminary decision was to side with counsel and not the defendant:

I think you are right in what to do but I mean—not factually—I mean as far as your right and his right, but I may even want to double check that.[10]

After another witness briefly testified, Blanco took the stand. His testimony was difficult to follow, and there were evident translation problems. After this testimony, the court and counsel held a bench conference off the record.

Following a recess, counsel returned and told the trial court in the presence of Blanco that during the recess the attorney told another lawyer in an elevator that "I had already received some condolences about the case...."[11] He was afraid jurors had heard the comments, and he wished to place the matter on the record.

The state's attorney, Satz, then raised the issue again of whether Blanco should be allowed to call witnesses. Tenbrook stated that there were only two other possible defense witnesses (Gonzalez and Romero). Tenbrook then told the court:

Mr. Satz ... feels that the law is that the defendant can require counsel to call a defense witness. I feel that calling a defense witness is a matter of personal judgment and strategy within the prerogative of defense counsel, and so long as there is a reason for not calling a witness or for calling a witness that decision is final.[12]

The trial court asked defense counsel about their conversations with their client: "Did you have additional conversation with Mr. Blanco to try to see—."[13] Defense counsel Rodriguez volunteered that "he is still of the same state of mind as far as calling them as witnesses."[14] Tenbrook then stated, "I reviewed this with my chief assistant, Bob Wills, in our office. He doesn't agree with me. He feels the defendant has the final decision on whether or not to call a witness. Respectfully, I don't. I don't ... take my orders on how to try my cases from Bob Wills any more than I do from my clients."[15]

The court inquired again about whether Blanco had been informed by counsel of the detrimental effect they thought the requested testimony might have in the case. Rodriguez revealed that he had had conversations with Blanco about the witnesses. Rodriguez then talked to Blanco, again, and revealed to the judge that his client had expressed to him that he was "still of the same state of mind, that is, he would want these witnesses called."[16] The judge indicated that if he ruled that the defense counsel had to have the witnesses testify, he thought that there should be a record made that counsel had told their client that

7. Trial transcript, at 1413.

8. *Id.* at 1414–15.

9. *Id.* at 1415.

10. *Id.* at 1416.

11. *Id.* at 1443.

12. *Id.* at 1446–47.

13. *Id.* at 1447.

14. *Id.*

15. *Id.* at 1448.

16. *Id.* at 1449.

the testimony would be detrimental, that the client understood that, and that the client still wished to have the testimony presented.

Although the record does not reflect how the judge might have known that Blanco had taken the stand against his attorneys' advice, the court said: "I think you ought to also put on the record that he desired to take the stand over and above your recommendations. That is what you indicated before; is that right?" Rodriguez responded, "That's correct, Your Honor." [17] Apparently, counsel had told the court, off the record, that his client had taken the stand against his advice.

Satz, the state's attorney, again pushed for Blanco to be allowed to put his witnesses on the stand. The trial court opined at that point that the appropriate test was whether Blanco was competent to represent himself and waive counsel:

THE COURT: What I'm trying to do, I'm trying to analogize this. If Mr. Blanco decided at this point that he wanted to handle the rest of the case himself—

MR. SATZ: He could.

THE COURT: Well, wait a minute. I think I'd have to make a determination as to whether he was competent to handle the case himself. If I decided that he was, I would probably ask these attorneys to continue to sit here if he had any questions for them, or to assist him at his request.

I almost put that in the same category as this. At this point I'm not—I think it might be a good rule to determine whether Mr. Blanco was competent to make this decision. I think this is what Mr. Tenbrook is saying or it sounds that way.

Already, he decided on his own decision to take the stand, which the law is clear on. He can do that whether the attorneys like it or not, but it sounds to me from what I heard it probably hurt his case a little bit and his attorneys probably feel that way, too, and it seems like the attorneys are better judges of

how this case should be handled than Mr. Blanco.

MR. SATZ: I agree with that.

THE COURT: Unless it's an automatic right for him to say which witnesses he wants to call and which ones he doesn't I think I'd almost have to handle it, to determine whether he is competent to make a decision of that nature.

MR. SATZ: I don't think so. I think he has an automatic right to call the witnesses he wants to call after he's had benefit of counsel.[18]

The trial court again asked counsel about their conversations with their client. Then Blanco was brought up to the bench and the court asked whether Blanco was satisfied with his attorneys, to which he responded "regular." Blanco said he was a little angry with them earlier, but that "I'm ok with them now." [19] The court asked what he was angry about, and Blanco responded, the "problem with the witnesses." [20] Blanco said he was concerned about the two witnesses discussed earlier, and three other witnesses who he had wanted to call. The court asked Blanco directly what additional witnesses he wanted to call, and Blanco responded that he wanted Theodoro Martinez, Barbara Lazo, and Carmen Alonso called. The court asked whether Blanco had discussed this matter with his attorneys; he responded that he had and they had indicated that they thought it would be detrimental for him to call the witnesses. He still wished for the witnesses to come. He indicated that his attorneys had not told him why the testimony would be detrimental, and the court instructed counsel to do so immediately.

The court told counsel Rodriguez to explain to Blanco why counsel believed the witnesses would be detrimental. Rodriguez mentioned that two out of three of the additional witnesses that Blanco had mentioned had been listed by defense counsel on a witness list filed the first day of trial. Rodriguez indicated that the attorneys had decided not to call these three

17. *Id.* at 1449–50.

18. *Id.* at 1453–54.

19. *Id.* at 1455.

20. *Id.*

additional witnesses; he also said he had tried to serve an additional witness, Barbara Lazo, with process, but she had moved. The court asked whether Blanco had been informed that the witnesses' testimony would be detrimental, and Rodriguez, defending himself, said that he had informed his client. Rodriguez and Blanco then spoke together in Spanish at the side of the courtroom.

Rodriguez then told the court about his discussion with his client:

> MR. RODRIGUEZ: Judge, he's just filed a motion, I believe, to have us withdrawn as counsel. He's upset about the situation. He's upset about the witnesses not being called and most upset, I think he is because I said that I couldn't get service on [Barbara Lazo], and he indicated to me that to his knowledge she hasn't moved and is still available.[21]

The motion was for a "change of counsel" and stated that the attorneys should withdraw because of a "conflict of interest," because the defendant was "[n]ot being represented in my best interest," and because there were "[n]o defense witnesses called in my behalf. I have informed counsel of witnesses for defense, but counsel has refused to call them." The motion also stated that "[c]ounsel does not do in court what he tells me privately he will do in court." At that point Tenbrook stated, "Your Honor, I join in on that motion. I respectfully join in on that motion."[22]

The trial court, confused by Blanco's sudden turnabout, asked Blanco why he was unhappy with his counsel, when a few moments earlier it appeared that he was "regular" happy. Blanco responded that he believed his attorneys were lying to him: "they are lying to my face. He's not telling me the truth."[23] As the discussion continued, Blanco again indicated his distrust of his attorneys and revealed his lack of understanding of the adversarial process. Blanco informed the court that defense witness Rey Alonso, who had already testified, had not lived with Blanco at the

times about which Alonso had testified, and that defense counsel were lying to Blanco:

> [DEFENSE INTERPRETER GONZALEZ:] [Defense counsel] have only brought a person that's lived with me three days in Hollywood to question him, but he doesn't know that much about me because he's lived in Miami Beach; that he has done a favor for Omar Barrio to stay in the apartment for three days. Those were the days that he stood in the apartment, and that's the one they want to bring in, the one that's only been living with me for two or three days.
>
> He says I don't see this as correct. The ones that have lived with me are the ones they should bring here.
>
> He says Rey says that he's known me for four months, that since he lived in Tyler, and he said, but four months ago I was in jail, in Dade County. He says July and through November. He says how is it possible that he can know me from December on back.
>
> He said this is what is happening. He said they are lying to me.
>
> THE COURT: That's his own witness. Does he understand that?
>
> (Thereupon, Mr. Gonzalez and Mr. Blanco conversed in Spanish.)
>
> MR. GONZALEZ: He says no. He's not my witness.
>
> THE COURT: Didn't he want him called?
>
> (Thereupon, Mr. Gonzalez and Mr. Blanco conversed in Spanish.)
>
> MR. GONZALEZ: He said yes, to have him here, yes. They had told him that he was a witness for the State, or the police.[24]

Then Rodriguez defended the attorneys:

> MR. RODRIGUEZ: And you know I didn't mention him—I mentioned him as a witness in the case in our conversations. I didn't make any distinction between defense witness or State witness.
>
> He indicated to me he wanted him called so, therefore, I called him. This is

---

**21.** *Id.* at 1459.

**22.** *Id.* at 1460.

**23.** *Id.* at 1461.

**24.** *Id.* at 1463–65.

the only way I can guarantee he is going to be called. I can't guarantee Mr. Satz is going to call him.

I'm fairly sure Mr. Satz was not going to call him because he didn't list him as a State witness.[25]

Rodriguez went on to tell the court that the defense made a tactical decision not to call the witnesses Blanco wanted because their testimony was conflicting or irrelevant, and told the judge that he had discussed all this with Blanco. Defense counsel then explained his efforts to locate some of these witnesses. The state offered to help contact the witnesses, and the court ordered that the witnesses be contacted.

The court then hit upon a rather incongruous solution. Blanco could call his own witnesses based on his answer to one question: Had his attorneys told him it would be in his best interest if he himself did not testify?

THE COURT: What I'd like to know— ask Mr. Blanco one thing, and then I will make a decision whether he should be allowed to call whatever witnesses he wants. Tell him that.

(Thereupon, Mr. Gonzalez and Mr. Blanco conversed in Spanish.)

THE COURT: My question is: Is it true that his attorneys advised him that they felt that it would not be in his best interest if he himself testified.

THE DEFENDANT: (Through the Interpreter) Yes, they did tell me that.

THE COURT: Did they tell him why they thought that?

(Thereupon, Mr. Gonzalez and Mr. Blanco conversed in Spanish.)

MR. GONZALEZ: He said they only told me about Enrique and Fidel.

THE COURT: Did they tell him why they felt he should not testify?

THE DEFENDANT: (Through the Interpreter) Yes.

THE COURT: After they told him that, he made up his own mind and he decided that he wanted to testify anyway; is that true?

THE DEFENDANT: (Through the Interpreter) Yes.

THE COURT: All right. At this point then I am going to rule this way: Since Mr. Rodriguez has indicated that these witnesses do have some testimony which is beneficial to Mr. Blanco, I feel that it is incumbent upon you to accept Mr. Blanco's position, even though it be against your wishes, to put these witnesses on.

That will be his choice, and if other detrimental evidence comes in because of these witnesses, I think that is just the way it goes.[26]

Based on this "yes" answer, the court decided that Blanco could call whatever witnesses he wanted to call. Both defense counsel again moved to withdraw:

MR. TENBROOK: .... I feel that when acting as trial counsel for someone I need to be free to exercise my own independent judgment and if my own independent judgment is going to be limited on matters of who to call and what theory to present, and these type of tactical matters, I feel that I am not rendering effective assistance of counsel and I am being reduced essentially to a walking rule one, if you will, and I'm moving to withdraw on that basis.

MR. RODRIGUEZ: I will join in that, also.

MR. TENBROOK: That will be on behalf of myself and my office.

THE COURT: I will deny the motion.[27]

The attorneys now had an order, not from a client, but from the court: "I would ask that whatever witnesses are to be presented we get them immediately...."[28] The attorneys were told to conduct direct and cross-examination as usual:

[W]hatever questions are beneficial to your client I think should be asked by you on direct.

---

25. *Id.* at 1465.

26. *Id.* at 1467–69.

27. *Id.* at 1469. "Rule 1" was the predecessor to Rule 3.850, Florida Rules of Criminal Procedure, a mechanism for challenging the effectiveness of counsel.

28. Trial Transcript, at 1470.

MR. RODRIGUEZ: Can we limit Mr. Satz on his cross-examination?

THE COURT: Only within the rules of evidence.[29]

The court told counsel what to do: "I am going to ask defense counsel to contact all those witnesses, if possible. . . . and we are just going to have to come back in the morning with whatever witnesses you can find. . . ."[30] The discussions centered around who and where the witnesses were, and the court told the attorneys what to do with regard to attempting to locate the witnesses. For example, attorney Rodriguez said an investigator had tried to find Barbara de la Caridad Garcia, and he proceeded to read notes to the court written by an investigator to explain why the witness was not served. The court asked Blanco if he knew where she was, and decided, "Fine, we are going to let him make a call and get her up here. That's number one."[31]

Defense counsel continued to defend their actions in failing to call certain witnesses. At one point, the court asked Blanco which witnesses he wanted. When Blanco spoke in Spanish, Rodriguez interpreted that Blanco said "he doesn't want to tell me."[32] That witness was Carmen Alonso. The trial court then asked whether Blanco had read the deposition of Ms. Alonso:

MR. RODRIGUEZ: He can't read the deposition. I have to read it to him.

THE COURT: Have you ever read it to him?

MR. RODRIGUEZ: Yes, I have, Judge. I have explained to him what is in it. I have told this to him; that this is what she said in her deposition.

I have not taken the time to read, because it is a waste of time, to read it word by word. A person has to have a certain amount of trust in his attorney, that I'm not going to misrepresent to him what is in the deposition of Carmen Alonso.[33]

The court then asked Blanco whether Rodriguez had informed him of what Carmen Alonso said in the deposition. The defendant answered that he had told him she was nervous and did not wish to testify. The court then asked whether Blanco thought the attorney had told him everything that the witness had said in a deposition. Blanco responded "yes."[34]

THE COURT: All right. Is there anything that she said that he feels would be in his best interest if she took the stand?

(Thereupon, Mr. Gonzalez and Mr. Blanco conversed in Spanish.)

MR. GONZALEZ: He says I just want to tell you one thing before I answer that question.

THE COURT: Go ahead.

(Thereupon, Mr. Gonzalez and Mr. Blanco conversed in Spanish.)

MR. GONZALEZ: He says nobody can do me any harm up there whether it's against or for me. The only reason I want them to come here to talk is so that you can hear them and find out what motive and why they are lying, and that's why I want them to come here.

He says since they are lying, and if the lawyers could have done a good job, that they would have brought papers showing that he rented in 1980 and 1981 from the managers, and that would have proven that he has no relationship with them, that the one that has relationship with them is Rey Alonso, and the different areas that he has lived with them, and with Enrique Gonzalez, and Enrique Gonzalez, according to what Mr. Rodriguez told me, that he is lying, that he has lived with . . . him and Rey Alonso, in Hollywood.

He told him that he didn't know the address exactly, but that he did know the location and the name, but that one of the addresses he had found, where he had lived in May 1981 with Ray Alonso, with Enrique Gonzalez, and with Car-

---

**29.** *Id.*

**30.** *Id.* at 1483.

**31.** *Id.* at 1472.

**32.** *Id.* at 1473.

**33.** *Id.* at 1476.

**34.** *Id.* at 1477.

men, and with Carmen, the wife, in Hollywood—because Rey Alonso is lying.

Why is it they don't want to bring them all here to hear them, to see if they are telling the truth or to see if I'm lying.

THE COURT: Tell him I want to explain something to him about the rules of a trial which I don't think he understands.

The rules are if you call a witness, you don't call him to show that they are lying, because if you call a witness you vouch for their truth.

(Thereupon, Mr. Gonzalez spoke in Spanish.)

THE COURT: And so he's not going to be able to call Rey Alonso. He could call other witnesses to show Rey Alonso is lying, but he can't call Rey Alonso as his witness and be hostile to him.[35]

Despite the judge's explanations, Blanco insisted that he "didn't call Rey Alonso" and that Rey Alonso is "lying." [36]

Blanco said that his lawyer had said that Rey Alonso was a state witness, and then Rodriguez disputed his client's word, defended himself, and added:

MR. RODRIGUEZ: Judge, I really have no recollection whatsoever of telling [my client] that Rey Alonso was a State witness, and I did not really think it was any type of misunderstanding; that if he was to be called he had to be called by us as part of our case, and my client indicated that he wanted him called and put on the stand, as he did here in open court a few months ago, and I cannot require Mr. Satz to call him as a witness.[37]

The court quizzed Blanco about whether that was true or not.

Blanco then told the court that he believed Rey Alonso had committed the murder, and that he wanted Rey Alonso to testify about that matter. After discussing that with him for a while, the judge told Blanco to be seated. Defense attorney Rodriguez asked the interpreter on the record what his client had just said:

MR. RODRIGUEZ: What did he just say?

MR. GONZALEZ: He said he doesn't want any of them as his lawyers.

THE COURT: Tell him—just have a seat a minute. Maybe he wants you to call Rey Alonso and ask Rey Alonso if he perpetrated this crime.

MR. RODRIGUEZ: Judge, if I thought that Rey Alonso was going to admit to it, I would have asked him that question.

THE COURT: At this point, I am going to deny the motion to withdraw, as I previously stated.

MR. TENBROOK: His or ours?

THE COURT: Yours. I am going to deny Mr. Blanco's request to have you withdrawn.

So far, as far as I'm concerned, I feel that Mr. Blanco has had competent counsel.

However, I am going to rule that, as I previously stated, that Mr. Blanco has a right to call these witnesses as long as they have some evidence to present to the jury which may be beneficial to his case and corroborate other evidence which may be involved in the case, even though there may be some evidence which may be detrimental.

I think he has a right to have those witnesses called, so I am going to ask defense counsel to contact all those witnesses, if possible.

Mr. Blanco will have to have an arrangement to make a phone call to Barbara—what was her name?

MR. SATZ: Lazo.

THE COURT: Barbara Lazo or through Rey Alonso to try to locate her and also, Mr. Rodriguez, I'd ask if you could try to find her.

What we will do—there are other witnesses we can call, Romero and Gonzalez, this afternoon, and try to get these other witnesses. That's all we can do.[38]

Fidel Romero entered the courtroom from jail to testify as per the court's instruc-

---

**35.** *Id.* at 1477–79.

**36.** *Id.* at 1479–82

**37.** *Id.* at 1480.

**38.** *Id.* at 1482–83.

tions. Defense counsel had not reviewed the witness' deposition, since he had not intended to call him, so he asked for a few moments to go over the deposition. They stood in a corner of the courtroom and talked. Then Tenbrook informed the court that his client had just told him that he also wished to call his brother, Rodolfo Blanco, as a witness. The trial court asked if that was correct and petitioner responded that it was.

The trial court then had defense counsel call Fidel Romero and Enrique Gonzalez to testify. After their testimony, the court instructed Rodriguez to try to get the three or four more witnesses that Blanco desired. The court instructed petitioner to make similar efforts from jail. At this point, defense attorney Tenbrook mentioned that he was "fortunate" not to be able to speak Spanish, so he would not have to communicate with his client overnight as Blanco was trying to locate witnesses.

The court wished to have a charge conference. Rodriguez left, stating: "Tenbrook will handle the charge conference. I will take charge of the investigating." [39] Blanco thanked the judge.

The next morning court resumed. The judge asked for a report from Rodriguez regarding his attempts to find the witnesses the court had ordered him to find. Rodriguez said that he had spoken with his client's brother directly and had asked him to come to court:

MR. RODRIGUEZ: And I told him that I needed him to be here this morning, at 8:30 a.m.; here being the Broward County Courthouse.

I said to be in Room 740, which is my office, at 8:30 this morning. He indicated to me that his wife was in the hospital. I have no way of verifying whether she was or not. I have some doubt that she really was in the hospital.

I asked him—I said to him, "Look, your brother is on trial for his life. He needs you to be there. He needs you to be there as a witness on some background information which is really what

his testimony would entail, and he said, 'I'll be there.'"

Then I pointed out to him that there were several other people that I was trying to get ahold of and have here as witnesses in this case. I asked him if he knew them. He said he did.

I asked him to try to round them up and they could all come to my office, in Room 740, at 8:30. I told him I was trying to locate Barbarita Lazo.

THE COURT: Barbara Lazo.

MR. RODRIGUEZ: Carmen Alonso.

THE COURT: Carmen Alonso.

MR. RODRIGUEZ: And Theodoro Martinez.

THE COURT: Theodoro Martinez. All right, and you told him to try to locate them, also?

MR. RODRIGUEZ: Right. That's correct.

THE COURT: That is the last time you talked to him?

MR. RODRIGUEZ: That's correct.

THE COURT: Have you tried to call his home this morning to see if he is there?

MR. RODRIGUEZ: Judge, I have not tried this morning; no.

THE COURT: I don't understand why—what about Barbarita Lazo? [40]

Rodriguez then discussed his efforts to reach Barbarita Lazo. He said he telephoned her home and spoke with her mother, leaving the message that she had been subpoenaed.

I said, "I'm an attorney up here in Broward County. I'm in the middle of a trial and I need her to come as a defense witness...." [41]

Counsel then stated that Blanco had also reached Lazo's mother. Rodriguez stated that he had telephoned German Berrios, a witness from the previous day, to "have him try to round up these people." [42] Berrios was not home, and Rodriguez "left a message for Mr. Berrios to try to round up these same people. I gave him the list of

---

**39.** *Id.* at 1528.

**40.** *Id.* at 1617–18.

**41.** *Id.* at 1618–19.

**42.** *Id.* at 1619.

the names and to have them here at 8:30." [43]

Rodriguez further stated that he called a person who knew Theodoro Martinez, and told him to get Martinez to court before 8:30. The court then ordered Rodriguez to try harder, because Rodriguez had not called the witnesses that morning. The court "want[ed] it done right now." [44] After Rodriguez exited, the trial judge spoke with the state's attorney regarding which witnesses would be called in rebuttal. When that discussion concluded defense counsel Tenbrook decided to relate to the court what he and his client had been discussing:

> MR. TENBROOK: Judge, I was just speaking with Mr. Blanco about his efforts to contact the witnesses, and apparently he contacted basically the same people that Mr. Rodriguez did but in addition—

> THE COURT: Could we have Mr. Blanco state through his interpreter which persons he did call and what efforts he did make.

> MR. TENBROOK: Sure, Judge. I think that would be best. You want to tell the judge. [45]

The judge proceeded to quiz Blanco about his jail cell efforts to get witnesses to court. Blanco stated that he tried to reach his brother but he couldn't communicate with him because no one was there. He indicated that he tried to reach him at his brother's mother-in-law's house, but she would not accept the collect phone call, saying "that long distance phone calls cost a lot." [46] There were further discussions about other witnesses Blanco had difficulty in contacting by collect call from the jail. The trial court repeatedly quizzed Blanco about his efforts to get witnesses into court. One witness told Blanco that he needed someone official to tell him he had to come, from which the court concluded: "In other words, he wouldn't come voluntarily; is that it?" [47] Blanco then explained

that he had learned overnight that one witness had moved to another state. Rodriguez then returned to the courtroom, and the trial court asked him about his luck since he had left. He explained his efforts to contact witnesses, volunteering that when he called one witness' home he "didn't want to say Omar Blanco. If they are trying to avoid service, I thought there would be a problem." [48]

The state then told the court that there had been plenty of opportunities to subpoena people needed by the defense, inasmuch as it was June, the case had been pending since January, and had already been continued once. According to the state, "[t]he defendant has had every opportunity to get his witnesses here." [49]

The trial court proceeded to ask Blanco about what he thought his witnesses would testify to if they were brought to court. Blanco proffered that Barbara Lazo would testify about how long he had known Rey Alonso. He also said that he would prove through Lazo that Rey Alonso was lying. He was going to prove that through Carmen Alonso as well. His brother would testify about how Blanco looked in January, and whether Blanco had his "bag" then. The court then commented: "[I]t seems to me as though there's been substantial effort to raise these people." [50] The trial court asked defense counsel why they did not wish to call the witnesses, and both defense counsel explained to the court why they thought the testimony would be detrimental. The trial court continued to ask defense counsel about their conversations with their client regarding what their client had indicated the witnesses would provide. For instance, the judge asked Rodriguez what Theodoro Martinez would provide, and Rodriguez indicated that "[w]ell, [Blanco] told me that [Martinez] knew him when he came to this country and that type of information that he told you here today, but as far as anything that

43. *Id.*

44. *Id.* at 1620.

45. *Id.* at 1621–22.

46. *Id.* at 1623.

47. *Id.* at 1624.

48. *Id.* at 1629.

49. *Id.* at 1632.

50. *Id.* at 1639.

would, that I felt would help him in his case, I really haven't had any discussions with him pertaining to that, or he hasn't conveyed any information to me pertaining to that. We have discussed Theodoro Martinez." [51]

The Court, after one overnight recess to locate witnesses, decided:

Well, at this time then I'm going to find that substantial efforts have been made to reach these people. It seems to me that none of these people, including his own brother, wishes to cooperate with him, and it seems like nobody wants anything to do with supporting him in his defense.

It seems like every person was contacted, including being directly contacted by Mr. Blanco himself. He's asked for their help and they would not come.

At this point, from what's been stated, anyway, I think if they did testify as to what Mr. Blanco said, I think it would probably be cumulative. I think those items have already been brought out by the defense. They already know that there is an issue to that effect, and at this time I am ready to go forward.

If you have any further witnesses, you can present them. If not, you can rest.

Let the court record reflect that it is 11:00 o'clock. The case was called for 9:30. These witnesses were discussed yesterday afternoon, all afternoon, about Mr. Blanco's dissatisfaction with his counsel, and all this was brought up in the general area of, say, 3 o'clock, and there's been opportunity to locate these people and they are not here. So I am ready to go forward. [52]

Thus, the judge concluded that no one wanted anything to do with Blanco, including his brother, and they would not help him despite his requests. Tenbrook then volunteered that Martinez had said something disparaging to the press about Blanco, so he would not be a witness. After this discussion, the state asked the court whether subpoenas should be issued for

these people. The court responded, "I don't know. It's too late now. I'm going forward with the case." [53] Defense counsel said he did not care if the subpoenas went out, because he did not want to call the witnesses anyway. The court indicated that the subpoenas should have gone out the day before, and again stressed, "[I]t seems like no one wishes to cooperate with Mr. Blanco. They don't want to come in here in defense, and I think that is important to say, because I think that if they are forced in they possibly may be detrimental to him and may be hostile, so I don't know what benefit they would be to him." [54]

The jury returned a general verdict of guilty of first degree murder and armed burglary. At that point, defense attorney Rodriguez had the following discussion with the court:

MR. RODRIGUEZ: Judge, at this time I would ask the Court what the Court is considering as far as the penalty phase, the time on it.

THE COURT: I'm ready to go forward. I told you whatever witnesses you had to have available.

MR. RODRIGUEZ: Judge, I have one witness available at this time. I would request more time to prepare and equip me for the penalty phase.

Specifically, what I need to prepare is the psychiatric testimony of a Court-appointed psychiatrist.

THE COURT: Where is he?

MR. RODRIGUEZ: We don't have a Court-appointed psychiatrist only for the purpose of the penalty phase.

In addition to that, I would try to get Omar Blanco's brother up here. His brother has not appeared here today and I would like the opportunity to—

THE COURT: I'm sorry. I'm not going to discharge this jury. I want to go forward. I told you all. You all knew what may happen. You all knew there was a good chance a verdict of this nature would be rendered.

I told you all to be ready. [55]

---

**51.** *Id.* at 1643.

**52.** *Id.* at 1643–44.

**53.** *Id.* at 1646.

**54.** *Id.* at 1647.

**55.** *Id.* at 1752–53.

After the state indicated there was no objection to any delay, the trial court decided to continue the sentencing hearing until the next Tuesday, four days away. The jury was informed that "it's been indicated to me that there may be some evidence that the defense wishes to present in connection with that second phase in the proceedings involving some people who might not be available at this minute...."[56] The court continued, "[I]t may take some time to find these people, maybe a day or so."[57] The trial court told the jurors that the proceedings would be postponed "until some of these witnesses can be located and requested to appear."[58]

After the jury agreed that the continuance would not inconvenience them, the trial court again told them "there may be some evidence presented, and I'm sure there will be evidence presented for you to consider."[59] The trial court told the jurors that the sentencing hearing "could be an hour or two hours."[60] Tenbrook then indicated that he had a trial on Monday, the day before the rescheduled sentencing hearing, and that he might be unable to attend a scheduled sentencing charge conference that day. Before adjourning, the court told Rodriguez to spend Saturday, Sunday and Monday "get[ting] all the information you will need from Mr. Blanco as to who he wishes for you to contact to present in connection with the sentencing phase."[61] Then, the judge had the defense attorney quiz Blanco, and translate:

> Mr. Rodriguez, would you tell Mr. Blanco the reason why you requested that the sentencing phase be postponed so that he understands it, and if he has any comments to it he can make them at this point.
>
> MR. RODRIGUEZ: Judge, I have already advised him why I asked for a continuance on it and I will keep discuss-

ing it with him and see if he has any comment.

> THE COURT: What I mean does he have any comment about not having it now as opposed to next week?
>
> (Thereupon, Mr. Rodriguez and Mr. Blanco conversed in Spanish.)
>
> THE COURT: Mr. Rodriguez, do you have a comment as to my question? Does he have any comment to make about the fact that you did tell him why you postponed it?
>
> MR. RODRIGUEZ: That's right. I explained it to him.
>
> THE COURT: Did he seem to have any objection to that?
>
> MR. RODRIGUEZ: No, Judge. He seemed to say leave it up to the lawyers. That is basically what he said at this point.[62]

The next Monday evening, Tenbrook did not appear at the charge conference, but Rodriguez did. He was there with Blanco, but no interpreter was present. Since Rodriguez was talking, there was no translator. At this sentencing charge conference, defense counsel again made statements regarding communications he had had with his client. Specifically, the trial court turned to Rodriguez and asked him directly what evidence he intended to present at the sentencing hearing. Rodriguez readily responded.

He stated that he had spoken with his client about calling additional witnesses, specifically his client's brother. He then stated, "I don't believe he wants to do that." Rodriguez also said, "I don't believe his brother wants to come up here."[63] The trial court immediately said, "Can we get all of this on the record?"[64]

The trial court (at the state's suggestion) had the defendant stand before the court and answer questions through his own at-

**56.** *Id.* at 1759.

**57.** *Id.*

**58.** *Id.*

**59.** *Id.* at 1761.

**60.** *Id.* at 1762.

**61.** *Id.* at 1764.

**62.** *Id.* at 1764–65.

**63.** *Id.* at 1780.

**64.** *Id.* at 1781.

torney regarding who he wished to help him at sentencing. Rodriguez was the interpreter:

THE COURT: .... I'd like at this point for you to tell him who you thought might be in his best interest to be called, and what you thought they might say, and why you wanted to call them.

This I want in open court here, and I want you to get a response from him as to whether he wants these people. I want all this on the record, or whether he doesn't, and I want, you know—

MR. SATZ: Why don't you do it this way? Why don't you ask him to come up here, Carlos, and then you ask him and interpret. Why don't you tell him and then relate in the record what you told him and then—

MR. RODRIGUEZ: I asked him if he wanted his brother to come here tomorrow to testify in his behalf and he's indicated that he doesn't, Your Honor.

THE COURT: He doesn't?

MR. RODRIGUEZ: Let me talk to him a little bit about why I was thinking of calling him.

THE COURT: Tell him first it's his decision so he doesn't get mad at you, but tell him for the record you are putting down why you thought it might be in his best interest, but again it will be his final decision.

MR. RODRIGUEZ: All right.

(Thereupon, Mr. Rodriguez and Mr. Blanco conversed in Spanish.)

MR. RODRIGUEZ: I have explained to him, Judge, that the reason that I was thinking of calling his brother is to verify his family ties; the fact that he left some of his family in Cuba when he left; the type of strain; the type of emotional state he might have been in because of that, and also tell a little bit about his background, that kind of thing.

He's indicated he doesn't want me to call his brother as a witness.

THE COURT: Who else did you figure you might call?

MR. RODRIGUEZ: Judge, I had Dr. Curtis under subpoena for tomorrow morning. I am not planning on calling him.

THE COURT: What was he to say?

MR. RODRIGUEZ: Judge, he is the linguistics expert on Spanish and English translation, but he is also a cultural expert. That is part of his studies. He studies the Latin cultures and I was contemplating whether I could call him to show some type of cultural shock or mitigating circumstance along those lines.

I really do not anticipate calling him as a witness at this point because I don't think I can establish that. I think it's the type of argument that would be ridiculed. Certainly, it could be ridiculed by the State and perhaps by the jury simply because what, in effect, I would be arguing is that it is a cultural shock that has caused Mr. Blanco to be under extreme duress, that would cause him to kill somebody, and I just don't think that argument holds any merit, having reviewed it and looked at it.

THE COURT: Mr. Blanco says he didn't kill anybody so what good would that do? He's never told the man he killed anybody.

MR. RODRIGUEZ: That's correct.

THE COURT: So what kind of an argument would that be?

MR. RODRIGUEZ: It wouldn't be much of an argument. That's why I don't anticipate calling him.

THE COURT: Have you told Mr. Blanco you considered it and that you decided it would be a waste of time?

MR. RODRIGUEZ: I've told him. I'd just like to have a moment to explain why I'm not going to call him.

THE COURT: Ask him what his preference would be as to it.

(Thereupon, Mr. Rodriguez and Mr. Blanco conversed in Spanish.)

MR. RODRIGUEZ: Judge, he understands and he says he didn't want to call anybody so—

THE COURT: Is there any other people that you suggested to him that might be able to invoke some type of reasoning from the jury where they might not— where they may feel it would be in his best interest?

MR. RODRIGUEZ: Judge, we had discussed a psychiatrist and if I may just have a moment to discuss that with him.

(Thereupon Mr. Rodriguez and Mr. Blanco conversed in Spanish.)

MR. RODRIGUEZ: Judge, he is in agreement with me on this issue and we have discussed the possibility of calling a psychiatrist, and I just don't think it's a matter where he has any type of—he certainly does not have a competency problem, and he certainly does not have an insanity problem, and I've seen no evidence of any type of emotional duress that would constitute a mitigating factor in this case.

Frankly, I just don't think it would aid matters at all to call a psychiatrist and he is in agreement with me.

THE COURT: What about members of his family besides his brother? Does he have any here? Friends?

MR. RODRIGUEZ: His sponsor.

THE COURT: His sponsor, Rey Alonso?

MR. SATZ: Anybody, anybody?

THE COURT: Mrs. Alonso.

(Thereupon, Mr. Rodriguez and Mr. Blanco conversed in Spanish.)

MR. SATZ: He doesn't?

MR. RODRIGUEZ: Nada means nobody.

THE COURT: So he doesn't want to present any people to come up here and testify in his behalf regarding this phase of the proceedings?

MR. RODRIGUEZ: That's what he just stated, Your Honor.

THE COURT: You have explained to him the nature of the phase and what he might be able to present?

MR. RODRIGUEZ: That's right. I have explained to him what we are proceeding on and what I'm trying to show or possibly show through these witnesses.

The only one that I would be wanting to call would be possibly his brother and his brother, as I said, has shown a complete total disregard for Mr. Blanco insofar as wanting to appear here or appearing here, and I just don't think that type of attitude or that type of testimony is going to be beneficial to him at all.

Certainly, I could have his brother arrested if we had service on him and brought in here, but that is not going to do any good as far as any type of mitigating circumstances or background, or anything else.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Have you called his brother about this phase?

MR. RODRIGUEZ: I explained to him both phases when I called him on Friday, and I explained to him I might want him to appear, not only for the trial part but if it went into a sentencing phase, for the sentencing phase, and he indicated his willingness, but yet he hasn't contacted me. He hasn't appeared.

In an abundance of caution, I sent another subpoena out there. According to Norman Ouslander, one of our investigators, it was taken to the address where Rodolfo Blanco lived and given to his family.

Rodolfo was not there but he left it there with his family and he went through an explanation, explained to them what we were doing and served him with a subpoena for tomorrow.

Even if he did show up tomorrow, which I seriously doubt—

THE COURT: You won't call him?

MR. RODRIGUEZ: I don't think we will call him.

THE COURT: If he does show up, I'd like you again to ask Mr. Blanco if he wants his brother to testify, if he does show.

MR. RODRIGUEZ: I will, Judge.

MR. SATZ: He doesn't want anybody?

MR. RODRIGUEZ: That is exactly what I asked him. He said, "Nada."

MR. SATZ: Did you tell him he has a right to testify?

THE COURT: How about him?

(Thereupon, Mr. Rodriguez and Mr. Blanco conversed in Spanish.)

MR. RODRIGUEZ: Judge, I have explained to him he has a right to be a witness and the preliminary indication I

just got from him is that he does not want to be a witness.

THE COURT: He does not want to say anything in his own behalf?

MR. RODRIGUEZ: That is exactly what he just indicated.

THE COURT: Tell him if he changes his mind between now and tomorrow morning, that he can still speak in his own behalf if he'd like to.

(Thereupon, Mr. Rodriguez and Mr. Blanco conversed in Spanish.)

MR. RODRIGUEZ: He says he explained himself on the stand and they found him guilty and he really doesn't have much else to say.

THE COURT: Tell him he doesn't have to discuss the case itself.

At this phase he can say something about himself, who he is, and his background, and if he wants to himself he can ask the jury to recommend life imprisonment if he wants to.

Explain that he doesn't have to go over the case again.

(Thereupon, Mr. Rodriguez and Mr. Blanco conversed in Spanish.)

MR. RODRIGUEZ: Judge, he says he's indicated—I explained to him what you just wanted me to explain to him as far as this phase and not having to review the case, or anything along those lines, and he indicated that he didn't really care what they recommended.

THE COURT: All right, Tell him he can have a seat again.

MR. RODRIGUEZ: Okay.[65]

The next morning, June 15, 1982, the sentencing hearing was held. The state introduced evidence of a prior armed burglary conviction, and the defense offered no evidence. The trial court once again asked the defendant whether he wished to testify, and he said that he did not. The court then asked Rodriguez whether anyone had contacted him about speaking in Blanco's behalf, and he said no.

Following closing arguments and the judge's charge, the jury retired to deliberate. The jury returned with their recommendation in fifteen minutes, voting eight to four in favor of the death penalty.[66]

A week later, the trial court imposed the death sentence. The trial court found four statutory aggravating circumstances (two of which were reversed on appeal) and found no mitigating circumstances.[67]

## B. *Guilt Phase Errors*

Blanco's guilt phase claims arising out of the above-recited facts relate to whether he received effective assistance of counsel. Although Blanco contends at times that he was denied altogether the assistance of counsel, our interpretation of the interaction between the trial court, the attorneys, and Blanco indicates that Blanco had the advice of counsel at all times but that Blanco at one point was allowed by the trial court to make decisions traditionally reserved for counsel.[68]

### 1. Actual Prejudice

■ We have examined whether Blanco suffered actual prejudice during the guilt phase of the trial without first attempting to analyze the precise errors that might have been made by counsel.[69] The Supreme Court has described the appropriate inquiry in an assessment of prejudice stem-

---

65. *Id.* at 1781–89.

66. *Id.* at 1848.

67. *See Blanco v. State,* 452 So.2d at 525–26.

68. *See Crutchfield v. Wainwright,* 803 F.2d 1103, 1108 (11th Cir.1986) (en banc) (contrasting claim of ineffective assistance of counsel with claim of denial of assistance of counsel), *cert. denied,* 483 U.S. 1008, 107 S.Ct. 3235, 97 L.Ed.2d 740 (1987).

69. *See Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984) ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

ming from ineffective assistance of counsel during a guilt phase trial:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.[70]

Under this standard, we conclude that the trial court's actions and defense counsels' responses did not prejudice Blanco during the guilt phase of his death penalty trial. While attempting to be helpful to Blanco the trial court overreached its authority and infringed upon the relationship between Blanco and his attorneys by requiring defense counsel to call two additional witnesses. Generally, trial tactics are for defense counsel to formulate.[71] The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel.[72]

Yet the only impact the trial court's actions had during the guilt phase of the trial was to cause two witnesses, Gonzalez and Romero, to be called. The extensive colloquy discussed above was out of the hearing of the jury and so did not have an effect upon their verdict. The testimony of these two witnesses was essentially in accordance with that presented by the two defense witnesses already called by Blanco's attorneys on the issue of Blanco's purse, which Blanco claimed was left at the murder scene by someone else. Two previous witnesses had testified that Blanco lost his purse and identification papers shortly before the offense.[73] Gonzalez and Romero also testified that Blanco had lost his purse in the period of time preceding the murder.[74] The additional testimony was thus essentially cumulative and supportive of Blanco's defensive theory.

Blanco argues that he was prejudiced because, although the first two purse witnesses did not have criminal records, both Gonzalez and Romero previously had been charged with crimes. And, the prosecution emphasized this fact during closing argument.[75] However, the district court determined (and we agree) that "[i]n light of all the testimony presented, especially that offered by [the state] in its case-in-chief, the evidence so overwhelmingly established Blanco's guilt that any contradiction presented by these two witnesses had a *de minimis* impact upon the guilt-innocence portion of Blanco's trial."[76] As the Florida Supreme Court's above-quoted summary of the facts reveals, Blanco's guilt was clearly established by the state. Thalia Vezos observed Blanco for several minutes in her room immediately prior to the murder. Blanco was arrested shortly after the murder while riding a bicycle one and one-half miles from the murder scene. A neighbor saw a figure leaving the murder scene dressed in clothes like those Blanco was wearing when arrested. Blanco's purse and identification papers were found at the scene of the crime. Also, gunpowder resi-

---

70. *Id.,* 466 U.S. at 695, 104 S.Ct. at 2068–69.

71. *See Coco v. United States,* 569 F.2d 367, 371 (5th Cir.1978) (" 'A lawyer must be able to determine questions of strategy during trial, and unless there are exceptional circumstances or unless the lawyer is so incompetent as to deprive the defendant of the right to effective assistance of counsel, his decision regarding trial strategy must be binding.' " (quoting *United States ex rel Cruz v. LaVallee,* 448 F.2d 671, 679 (2d Cir. 1971))).

72. *See Tosh v. Lockhart,* 879 F.2d 412, 414 (8th Cir.1989) ("[T]he decision not to use alibi testimony may reflect the reasonable exercise of judgment in view of the attorney's concern that the testimony would be conflicting ... or otherwise unfavorable." (citations omitted)); *United States v. Miller,* 643 F.2d 713, 714 (10th Cir. 1981) ("Whether to call a particular witness is a tactical decision and, thus, a 'matter of discretion' for trial counsel." (citation omitted));

*Buckelew v. United States,* 575 F.2d 515, 521 (5th Cir.1978) ("the presentation of testimonial evidence is a matter of trial strategy"); *O'Malley v. United States,* 285 F.2d 733, 734 (6th Cir.1961) ("Counsel's decision not to subpoena or use certain witnesses is often a matter addressed to the judgment of the trial attorney." (citation omitted)); *cf. Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (holding that defendant has no right to determine which nonfrivolous issues appointed counsel would press on appeal).

73. Trial transcript, at 1316–50.

74. *Id.,* at 1504 (Romero); *Id.,* at 1511 (Gonzalez).

75. *See id.,* at 1686–87.

76. *Blanco v. Dugger,* 691 F.Supp. at 329.

due was found on the back of Blanco's hands, indicating that he had recently fired a weapon.[77]

Omitting the testimony of the two additional witnesses that the trial court caused to be called does not create a "reasonable probability" that "the factfinder would have had a reasonable doubt respecting guilt." The strength of the evidence against Blanco makes it extremely unlikely that the jury would have had a reasonable doubt about Blanco's guilt. Blanco's argument that the jury might have had such a reasonable doubt if Gonzalez and Romero had not testified does not fill the large hole in Blanco's trial defense: Even if the jury had believed the testimony of the first two witnesses, the fact that Blanco lost his purse shortly before the murder does not necessarily show that Blanco did not find his purse prior to the murder. And the state impeached Blanco's statements at trial that he had lost his purse prior to the murder by introducing the testimony of an interrogating officer to the effect that Blanco stated after his arrest that his identification papers were at his apartment.

### 2. Presumed Prejudice

Blanco additionally argues that prejudice should be presumed due to the trial court's interference. The Supreme Court held in *Washington* that "[i]n certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance."[78] Also, "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make indepen-

dent decisions about how to conduct the defense."[79] In *United States v. Cronic*,[80] the Supreme Court held that prejudice sometimes may be presumed "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."[81] Moreover, "The Court has uniformly found constitutional error without a showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceedings."[82]

This circuit has interpreted the Supreme Court's opinions concerning presumptions of prejudice in ineffective assistance of counsel claims. We have held,

> [E]xceptions to the [*Washington*] [prejudice] standard are appropriate only when the circumstances would offend basic concepts of due process. When such prejudicial circumstances exist, the concern is with procedural fair trial requirements, and not with whether the defendant would have been found guilty.[83]

We have also held,

> In *Cronic*, the Court carved out a narrow exception to *Washington*'s general rule that a defendant must demonstrate prejudice: a showing of prejudice is not necessary if there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Circumstances which would warrant a presumption of prejudice from counsel's ineffectiveness are those where "the adversary process itself is [rendered] presumptively unreliable [by the circumstances]."[84]

---

**77.** Trial transcript, at 1241.

**78.** *Washington*, 466 U.S. at 692, 104 S.Ct. at 2067 (citation omitted).

**79.** *Id.*, 466 U.S. at 686, 104 S.Ct. at 2063 (citing to, *inter alia*, *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (bar on attorney-client consultation during overnight recess)).

**80.** 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

**81.** *Id.*, 466 U.S. at 659–660, 104 S.Ct. at 2047.

**82.** *Id.*, 466 U.S. at 659 n. 25, 104 S.Ct. at 2047 n. 25 (citations omitted).

**83.** *Stano v. Dugger*, 921 F.2d 1125, 1154 (11th Cir.1991) (en banc).

**84.** *Chadwick v. Green*, 740 F.2d 897, 900 (11th Cir.1984) (citations and footnote omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 620 (11th Cir.1985) ("[T]he burden of proof under *Cronic* is a very heavy one."), *cert. denied* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986).

■ This case does not involve circumstances appropriate for a presumption of prejudice. While the trial court did interfere with the conduct of the defense during the guilt phase to some degree, this interference was not great, and the particular prejudice flowing from it is easily discernible and therefore not costly to litigate.[85] The interference amounted to countermanding the attorneys' strategic decision not to call two witnesses, nothing more. Blanco's attorneys were not otherwise hampered in their conduct of the guilt phase defense. Blanco's attorneys examined the witnesses on the stand. And Blanco was not prevented from consulting with his attorneys for any period of time. "Basic concepts of due process" were not offended by the trial court's actions. We refuse Blanco's invitation to presume prejudice.

■ As part of his claim that guilt phase prejudice should be presumed as a result of the trial court's intervention, Blanco makes the additional argument that the trial court essentially allowed Blanco to represent himself but failed to conduct an inquiry under *Faretta v. California.*[86] The district court found that Blanco never indicated a desire to represent himself and simply asked for a change of counsel, which request was denied.[87] Blanco is correct that he in effect represented himself as to the single decision to call the two additional defense witnesses. But this brief lapse in representation by counsel does not constitute a total absence of counsel or prohibition from providing assistance such that a presumption of prejudice is appropriate.[88] During Blanco's limited period of self-representation, his attorneys advised him as to the reasons they did not think the two additional witnesses should be called.[89] Blanco thus did have the advice of counsel in making his decision to call Gonzalez and Romero, even if he chose not to follow it.[90]

■ Both parties contend that the district court "in effect" found that an actual conflict of interest existed.[91] There is a limited presumption of prejudice in conflict of counsel cases.[92] However, we do not

---

**85.** *See Stano*, 921 F.2d at 1171 (Tjoflat, C.J., & Johnson, J., dissenting) ("An obvious rationale supports this per se [presumption of prejudice in certain cases implicating the right to assistance of counsel]: given the actual or constructive denial of counsel at a critical stage, it is practically impossible to conduct a prejudice inquiry in a collateral proceeding."); *cf. Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) (Rehnquist, C.J., & O'Connor, Scalia, Kennedy, & Souter, JJ.) (discussing cases in which harmless error analysis is appropriate; "The common thread connecting these cases is that each involved 'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.").

**86.** 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); *see, e.g., Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.) ("A trial court's evaluation of an individual's desire to represent himself is fraught with the possibility of error. Because self-representation necessarily entails the waiver of the sixth amendment right to counsel, a trial court can commit reversible constitutional error by either improperly granting a request to proceed pro se—and thereby depriving the individual of his right to counsel—or by denying a proper assertion of the right to represent oneself, and thereby vio-

lating *Faretta.*" (citations omitted)), *cert. denied,* —— U.S. ——, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990). *See generally Strozier v. Newsome,* 926 F.2d 1100, 1105 (11th Cir.1991) (waiver of trial counsel permissible even if trial court does not conduct competency hearing).

**87.** *Blanco v. Dugger,* 691 F.Supp. at 328 n. 16.

**88.** *Cf. Jackson v. James,* 839 F.2d 1513 (11th Cir.1988) (appellant deprived of right to counsel when he was required to represent *himself* through voir dire, opening statements, and testimony of eight of nine witnesses); *Harding v. Davis,* 878 F.2d 1341, 1344 (11th Cir.1989) (presuming prejudice in case in which attorney "did *nothing to fulfill the obligations of his position as counsel").

**89.** Trial transcript, at 1456–57.

**90.** *Cf. United States v. Mills,* 704 F.2d 1553, 1557 (11th Cir.1983) (self-representation where counsel continues to act in advisory role permissible in federal court in discretion of trial court), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984).

**91.** *See Blanco v. Dugger,* 691 F.Supp. at 331.

**92.** *See Washington,* 466 U.S. at 697, 104 S.Ct. at 2067.

analyze this case in terms of conflict of interest, because the alleged conflict was only between the lawyers' duties to the court and their duties to their client. Attorneys, as officers of the court, could be said to have such a conflict in practically every case involving ineffective assistance. Just because Blanco's counsel acquiesced in and did not object to the trial court's interference does not show that they "actively represented conflicting interests."[93] We therefore reject Blanco's argument that prejudice should be presumed because of a conflict of interest. We accordingly affirm the district court's refusal to grant habeas relief due to the trial court's interference and counsels' ineffectiveness during the guilt phase of Blanco's trial.

## C. Penalty Phase Errors

The district court granted habeas relief to Blanco on claims arising out of several aspects of the interaction between trial court and defense counsel that impinged upon Blanco's sentencing hearing. The district court ordered resentencing because Blanco's attorneys were ineffective in allowing the trial court—the ultimate sentencer—to interrogate Blanco without objection as to prejudicial information.[94] The district court also based relief on defense counsels' ineffectiveness in disclosing the defense strategy to the trial court.[95] But the district court rejected Blanco's complaint that his trial counsel were ineffective for failing to present mitigating evidence

during the sentencing proceedings.[96] We find that, due to the trial court's intervention and other factors, Blanco's attorneys were generally ineffective during the sentencing phase of the trial.

### 1. Procedural Default

The state argues that Blanco's claims relating to (1) defense counsels' failure to prevent the trial court from interrogating Blanco and (2) defense counsels' revelation of strategy are procedurally defaulted, because these claims were presented for the first time in Blanco's motion for post-conviction relief. The state asserts no procedural bar to Blanco's claim of ineffectiveness concerning the presentation of mitigating evidence. The state cites to the Florida Supreme Court's refusal to consider claim (1) on Blanco's collateral appeal.[97] However, the Florida Supreme Court did not refuse to consider the *ineffectiveness* aspect of this claim on collateral review, but only the substantive aspect of this claim, which it found to have been presented and rejected on direct appeal.[98] The Florida Supreme Court did consider the essence of the ineffectiveness aspect on collateral review when it rejected Blanco's argument concerning the existence of a conflict of interest.[99] The claim is thus exhausted, not procedurally defaulted, and it is properly before us. As to claim (2), Blanco raised this issue in his motion for post-conviction relief as part of his ineffectiveness claims, and the Florida Supreme

93. *Id.* (internal quotations omitted).

94. *Blanco v. Dugger,* 691 F.Supp. at 329–331.

95. *Id.* at 331.

96. *Id.* at 325–26.

97. *See Blanco v. Wainwright,* 507 So.2d at 1380 ("We find that eight of [Blanco's] claims are procedurally barred either because they either were or should have been presented on direct appeal ... (3) did the trial court err in questioning appellant concerning the presentation of his defense....").

98. *See id.* at 1381 ("On claim three, appellant attempts to revise claim one, which was presented and rejected on direct appeal, into a claim that the trial judge violated appellant's right against self-incrimination by questioning him

on disagreements he had with defense counsel concerning the calling of witnesses. We rejected the core of this argument on direct appeal and see no impropriety in the judge directly addressing appellant concerning his desires on the conduct of the trial."). We note that the substantive aspect of this claim was therefore exhausted.

99. *See id.* at 1383. *See generally Hutchins v. Wainwright,* 715 F.2d 512, 519 (11th Cir.1983) ("The applicable law requires that a habeas corpus petitioner present 'the substance of a federal habeas corpus claim' to the state courts. However, it is not required that the petitioner present book and verse on the federal constitution.... [I]t is the substance of the claim that the court looks to in analyzing whether a federal claim has been voiced." (citations omitted)), *cert. denied,* 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984).

Court did not explicitly assert a procedural bar.[100] To the extent the Florida Supreme Court did assert a procedural bar, the bar was only a result of Blanco's prior exhaustion of this claim on direct appeal. On both of these claims, Blanco clearly has skirted the Scylla and Charybdis of the federal courts' exhaustion and procedural default requirements.

### 2. Counsels' Sentencing Deficiencies

The Supreme Court requires that "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."[101] In this case, the performance of defense counsel with regard to the sentencing proceedings was objectively deficient in a number of ways.

### a. *Ineffectiveness Due to Trial Court Interference*

■ As can be seen plainly from the record as set out above,[102] the effectiveness of Blanco's attorneys was significantly impaired by the trial court's intervention in the conduct of the sentencing trial. Blanco became suspicious of the motives of his attorneys, and their efforts were frustrated by the differing and disparate demands made upon them by the court and their client. The trial court's supervision and Blanco's distrust caused counsel to become defensive and to volunteer inappropriate information to the trial court. Due to counsels' delayed and ineffectual efforts to locate witnesses, no evidence at all was presented during the sentencing phase. The district court effectively summarized the evidence relating to many of these errors:

[Attorney] Rodriguez, acting as interpreter for Blanco, told the court that Blanco did not care whether the jury recommended a life or death sentence. Rodriguez also stated, without prodding from the court, that although counsel desired to call Blanco's brother, Blanco did not want his brother to testify because his brother had shown a lack of [ ]regard by not appearing at trial. Blanco therefore believed that his brother's testimony would not be beneficial. Rodriguez then volunteered that, although Blanco did not want his brother to appear at the sentencing hearing, he contacted him in any event, but that his brother would not likely appear. Rodriguez also stated that other possible witnesses had been called but that none of them had contacted defense counsel.[103]

The state characterizes the statements that Blanco's attorneys volunteered as mere assurances that counsel no longer had a disagreement with Blanco as to which witnesses would be called during the sentencing phase of the trial. However, the trial judge's questioning went on for many transcript pages and was not only an inquiry into whether Blanco knew that his attorneys were acting on his behalf. The court was intent on getting Blanco's and counsels' testimony on the record. The trial court's queries encompassed "who you [counsel] thought might be in his best interest to be called, and what you thought they might say, and why you wanted to call them."[104] Furthermore, counsels' statements went far beyond what was necessary to respond to the court's inquiries.

---

**100.** *See Blanco v. Wainwright,* 507 So.2d at 1383 ("Appellant next argues that a conflict of interest developed between counsel and himself because of disagreements over whether to call certain witnesses and his own decision to testify and the subsequent disclosure of these disagreements to the trial judge by counsel. We do not agree that this constitutes a conflict of interest or that the disagreements adversely affected counsel's performance.... Appellant is simply taking an issue which has already been decided adversely to his position on direct appeal and attempting to relitigate it under the guise of ineffective assistance of counsel."). *See generally Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct.

1038, 1043, 103 L.Ed.2d 308 (1989) (state court must "clearly and expressly" declare that ruling rests on procedural default before claim will be barred from federal court).

**101.** *Washington,* 466 U.S. at 687–88, 104 S.Ct. at 2064.

**102.** *See supra* part III.A.

**103.** *Blanco v. Dugger,* 691 F.Supp. at 330 (citations omitted).

**104.** Trial transcript, at 1781.

When the trial court questioned counsel as to whether there were any further disagreements, counsel should have simply responded in the negative. Blanco's attorneys did not need to tell the sentencing court that there was no potential mitigating evidence and that none could be found.

We agree with the district court's conclusion that Blanco was denied the effective assistance of counsel by his attorneys' disclosures. Without objection, his two attorneys revealed confidential, damaging information in response to the court's inquiries. This case is aptly described by the words of *Douglas v. Wainwright:* [105]

> The most egregious examples of ineffectiveness do not always arise because of what counsel did *not* do, but from what he *did* do—or say. Apparently failing to appreciate that the trial judge was the ultimate sentencer, counsel repeatedly emphasized to the judge, during the conference in chambers and out of the hearing of the jury, that not only did counsel have no evidence to proffer at that time but that apparently there was no mitigating evidence that could be produced in Douglas' case.[106]

We can imagine no tactical reasons for the revelations made by counsel, and none have been proffered. We do not hesitate to find that counsels' errors were not "within the range of competence demanded of attorneys in criminal cases." [107]

### b. *Ineffectiveness Due to Failure to Present Mitigating Evidence*

■ We disagree with the district court's conclusion that counsel were not deficient in their failure to present any mitigating evidence. In order to ascertain whether counsels' failure to present penalty phase mitigating evidence was deficient, it must be determined whether a *reasonable investigation* should have uncov-

ered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a *tactical choice* by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.... [If not], it must be determined that defendant suffered *actual prejudice* due to the ineffectiveness of his trial counsel before relief will be granted.[108]

In this case, the attorneys failed to conduct a reasonable investigation, and this failure was not a result of a tactical choice.

Following the jury's guilty verdict, defense counsel Rodriguez informed the court that he was not prepared for the penalty phase and needed a continuance to locate witnesses. The trial court stated that he had previously informed counsel that the sentencing phase would commence immediately after the guilt phase was completed. The trial court nevertheless continued the trial for four days, informing the jury that Blanco needed time to produce witnesses.

The next court proceedings were held on the evening before the sentencing phase was to begin. During this charge conference, the trial court queried counsel and Blanco as to the efforts that had been made to locate witnesses. The transcript of the charge conference and attorney Rodriguez' testimony at the collateral hearings are not clear as to what further steps, if any, counsel took over the four-day continuance. Although counsel did attempt to subpoena Blanco's brother to testify, it appears that counsel for the most part waited for the witnesses that Blanco and counsel previously had attempted to contact during an overnight recess in the guilt phase to return their calls.[109] Counsel never managed to meet with any of these wit-

---

**105.** 714 F.2d 1532 (11th Cir.1983), *vacated,* 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874 (1984), *adhered to on remand,* 739 F.2d 531 (11th Cir. 1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).

**106.** *Id.* at 1557 (emphasis in original).

**107.** *Washington,* 466 U.S. at 687, 104 S.Ct. at 2064 (citation and internal quotations omitted).

**108.** *Middleton v. Dugger,* 849 F.2d 491, 493 (11th Cir.1988) (emphasis in original; citation omitted).

**109.** Trial transcript, at 1786 ("THE COURT: By the way, just for information on the record, have you had contact with any of those people that he wanted brought in at an earlier time? .... MR. RODRIGUEZ: None of them have called. None of them left messages.").

nesses over the continuance to determine what their testimony might be. With the exception of Blanco's brother, counsel had not talked to any of these witnesses. The record reflects that counsel and Blanco had further conversations concerning the witnesses who would be called during sentencing, and that Blanco indicated he did not want any evidence offered on his behalf.[110] Counsel essentially acquiesced in Blanco's defeatism without knowing what evidence Blanco was foregoing. Counsel therefore could not have advised Blanco fully as to the consequences of his choice not to put on any mitigation evidence.

Blanco presented evidence before the state collateral relief court and the district court that ample mitigating evidence could have been presented before the sentencing jury and judge. Blanco's brother testified that he would have gladly come and given testimony on Blanco's behalf, but he was never contacted by Blanco's attorneys.[111] A number of Blanco's acquaintances from Cuba had immigrated to the United States and would have been willing to give mitigation testimony.[112] These witnesses could have testified as to Blanco's difficult childhood and adolescence. Their testimony at the state collateral relief proceedings was to the effect that Blanco was born to a large family of subsistence farmers in Cuba. His birth was attended with serious medical difficulties, including an initial lack of oxygen. As a child, Blanco suffered from seizures that caused his tongue to become stuck in his throat. Blanco's grandmother had a history of psychosis that required hospitalization. Although Blanco committed several criminal violations while in Cuba, these were relatively minor. His convictions involved an absence without leave from his military garrison and thefts of a bicycle, a lamb, and a pair of shoes. While in prison, Blanco befriended at least one Cuban political prisoner, who became Blanco's sponsor when Blanco

immigrated to the United States during the Mariel boatlift.

Blanco also presented evidence of organic brain damage and epileptic disorders. One of Blanco's psychiatric witnesses at the federal evidentiary hearing testified that Blanco's IQ tested in the borderline range of intellectual functioning, between being mentally retarded and possessing low average mental ability. Blanco was diagnosed as suffering from psychotic, paranoid and depressive tendencies as well as exhibiting extremely poor contact with reality.

### (1) Background Mitigating Evidence

█ In rejecting Blanco's argument that counsel were ineffective for failing to present evidence relating to his background, the district court noted that counsel tried to reach a number of Blanco's relatives and acquaintances without success. However, counsel had approximately five months to prepare for trial. Counsel apparently did not personally seek out any witnesses specifically for sentencing prior to trial. When attorney Rodriguez testified at the district court evidentiary hearing, he was asked why he did not pursue these potential witnesses further:

> Really, I think it was just a matter of time. I don't know if you can tell from the transcript or not, but this is during the trial where we are running until six or seven at night, and there is just not that much you can do at six or seven at night.[113]

Blanco's counsel needed to talk to the witnesses suggested by Blanco, determine whether they could provide helpful testimony, and seek leads on other possible witnesses. From what we can determine, this was not done prior to trial. Once trial started, counsel were too hurried to do an adequate job. To save the difficult and time-consuming task of assembling mitiga-

---

**110.** *Id.,* at 1785 ("THE COURT: So he doesn't want to present any people to come up here and testify in his behalf regarding this phase of the proceedings? MR. RODRIGUEZ: That's what he just stated, Your Honor.").

**111.** State post-conviction relief hearing transcript, at 61.

**112.** *Id.* at 69 (Rosa Pinillos); *id.* at 85 (Simeon Pinillos); *id.* at 333 (Girardo Luis Herrara); *id.* at 346 (Martha Venegas).

**113.** R9–109.

tion witnesses until after the jury's verdict in the guilt phase almost insures that witnesses will not be available.[114] No adequate investigation was conducted in this case.

The district court also did not credit Blanco's arguments concerning the availability of background mitigating evidence, because it found that Blanco's attorneys made a strategic decision not to present such mitigating evidence. This strategic decision was purportedly based upon counsels' fears that Blanco's criminal background in Cuba would be brought into the trial.[115] However, this finding is belied by counsels' statements. Attorney Rodriguez stated to the trial court, "I think the testimony of a family member should be had at the penalty phase." [116] Rodriguez also informed the trial court, "[T]he reason that I was thinking of calling his brother is to verify his family ties; the fact that he left some of his family in Cuba when he left; the type of strain; the type of emotional state he might have been in because of that, and also tell a little bit about his background, that kind of thing." [117] Moreover, counsel referred to Blanco's status as a Mariel refugee both during voir dire and during closing argument. But counsel failed to introduce any evidence to differentiate Blanco from the stereotype of Mariel refugees as criminals.[118]

■ The state further contends that Blanco instructed his attorneys not to call any family members or acquaintances to testify. However, this court has held that a defendant's desires not to present mitigating evidence do not terminate counsels' responsibilities during the sentencing phase of a death penalty trial: "The reason lawyers may not 'blindly follow' such commands is that although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit." [119] According to the testimony of attorney Rodriguez in the district court, when Blanco and his attorneys first disputed which witnesses to call, Blanco "started acting irrationally"; "his whole demeanor really changed at that point." "He didn't respond.... [H]e was not responding to his attorneys in terms of you would explain something and you would say, this is the reason for it, and, you know, it would just be like talking to a wall." [120] Rodriguez also stated that Blanco was uncommunicative and easily angered. According to Rodriguez, after the jury returned its guilty verdict, Blanco became further depressed and unresponsive. This testimony is confirmed by the statements Blanco made during his discussions with the trial judge to the effect that he believed his attorneys were "lying to my face." During the precise period when Blanco's lawyers finally got around to preparing his penalty phase case, Blanco was noticeably morose and irrational. Counsel therefore had a greater obligation to investigate and analyze available mitigation evidence.[121]

---

114. *See Blake v. Kemp,* 758 F.2d 523, 533 (11th Cir.) ("It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness."), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985); *cf. Harris v. Dugger,* 874 F.2d 756, 763 (11th Cir.) ("[P]rior to the day of sentencing, neither lawyer had investigated Harris' family, scholastic, military and employment background, leading to their total—and admitted—ignorance about the type of mitigating evidence available to them."), *cert. denied,* 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989).

115. *See Blanco v. Dugger,* 691 F.Supp. at 325.

116. Trial transcript, at 1754.

117. *Id.,* at 1782.

118. *Cf. Card v. Dugger,* 911 F.2d 1494, 1511 (11th Cir.1990) (counsel not ineffective because failure to present background mitigation evidence resulted from trial strategy).

119. *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986) (citation omitted), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987). We note that a defendant's decision concerning the use of mitigating evidence is more an aspect of overall strategy than a decision as to which witnesses would provide the best legal support for a defense.

120. R9–90–91.

121. *See Thompson,* 787 F.2d at 1451 ("An attorney has expanded duties when representing a client whose condition prevents him from exercising proper judgment." (citation and footnote omitted)).

However, Blanco's attorneys, through their negative comments about their client and defensive comments about themselves,[122] instead exhibited signs of their own discouragement. The ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsels' eagerness to latch onto Blanco's statements that he did not want any witnesses called. Indeed, this case points up an additional danger of waiting until after a guilty verdict to prepare a case in mitigation of the death penalty: Attorneys risk that both they and their client will mentally throw in the towel and lose the willpower to prepare a convincing case in favor of a life sentence.

From these facts, we do not see that counsel conducted a reasonable investigation into the availability of mitigating evidence, or that there was a strategic reason for not presenting such evidence.

#### (2) Mental Health Mitigating Evidence

The district court also rejected the contention that Blanco's mental health mitigating evidence demonstrated ineffectiveness, because Blanco did not show that he was incompetent at the time of trial.[123] But there is a great difference between failing to present evidence sufficient to establish incompetency at trial and failing to pursue mental health mitigating evidence at all. One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.[124]

Counsel simply failed to investigate Blanco's mental health status. After the guilty verdict was rendered, one of the reasons counsel requested a continuance was because "I need to prepare … the psychiatric testimony of a Court–appointed psychiatrist."[125] No psychiatrist had been procured prior to this point, and no examination of Blanco was ever conducted. At conference the day before the penalty phase began, counsel informed the court after a brief discussion with Blanco that no mental health mitigation evidence existed.[126] Given that this discussion constituted the extent of counsels' investigation into the availability of mental health mitigating evidence, that such evidence was available, that absolutely none was presented to the sentencing body, and that no strategic reason has been put forward for this failure, we find that counsels' actions were objectively unreasonable.[127]

#### c. Conclusion

Counsel failed to protect Blanco's confidences and revealed damaging information to the sentencing judge. Counsel also failed to discover and present any of the available mitigating evidence. Singly and together, the errors committed by Blanco's counsel fell below an objective standard of reasonable representation.

#### 3. Sentencing Prejudice

The following standard governs our inquiry into the prejudice suffered by Blanco from counsels' actions: "When a defendant challenges a death sentence …, the question is whether there is a reason-

---

**122.** *See, e.g.,* trial transcript, at 1476 (attorney Rodriguez: "A person has to have a certain amount of trust in his attorney…."); *id.,* at 1526 (attorney Tenbrook remarks that it will be unnecessary to give Blanco his home phone number because he "[f]ortunately" does not speak Spanish).

**123.** *Blanco v. Dugger,* 691 F.Supp. at 326.

**124.** *See, e.g., Perri v. State,* 441 So.2d 606, 609 (Fla.1983) ("A defendant may be legally answerable for his actions and legally sane, and even though he may be capable of assisting his counsel at trial, he may still deserve some mitigation of sentence because of his mental state.").

**125.** Trial transcript, at 1752.

**126.** *Id.,* at 1784 ("[W]e have discussed the possibility of calling a psychiatrist, and I just don't think it's a matter where [Blanco] has any type of—he certainly does not have a competency problem, and he certainly does not have an insanity problem, and I've seen no evidence of any type of emotional duress that would constitute a mitigating factor in this case.")

**127.** *See, e.g., Middleton,* 849 F.2d at 493–95 (failure to present available mental health mitigating evidence constituted ineffective assistance).

able probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." [128] The district court emphatically found that counsels' actions prejudiced Blanco:

> [The state's] position ... that the trial court merely engaged in a harmless colloquy with Blanco is rejected on the strength of the clear violations demonstrated by the record. This was no ordinary colloquy, and despite the trial court's and even the prosecutor's good intentions, there is no denying the facts as [previously stated]. The trial court took control of the defense, and by the time the sentencing phase took place, defense counsel acquiesced in this procedure to the detriment of Blanco. Unfortunately, this prejudice is so apparent, it literally demands that a new sentencing hearing occur.[129]

We agree. As a result of the colloquy between counsel and court, the trial court concluded that none of Blanco's family or friends were willing to testify on Blanco's behalf during sentencing and that there was no other available mitigating evidence.[130] The trial court also concluded that Blanco did not care what punishment was imposed:

> [D]uring the sentencing phase of the trial for Murder in the First Degree, the Defendant, OMAR BLANCO, indicated he did not wish to speak in his own behalf or present any evidence regarding mitigation. He further stated that he did not care if the jury returned an advisory sentence of life or death. This expression by the Defendant, OMAR BLANCO,

indicates to this Court that the Defendant, OMAR BLANCO'S, lack of concern for his own life manifests that he would be a dangerous person to return to society. The Defendant, OMAR BLANCO'S, attitude also corroborates his prior exhibitions of utter disregard for the rights and safety of society.[131]

The district court found that the trial court reached this latter conclusion "only as a result of its interrogation of Blanco and his counsel concerning the availability of witnesses for the sentencing hearing and the *reasons* for calling or not calling witnesses. Manifestly, counsels' failure to protect their client's rights at the sentencing phase resulted in 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " [132]

The state argues that the fact that the trial judge knew that Blanco would not present mitigating evidence because he could not locate any favorable witnesses did not prejudice Blanco, because courts are allowed to make inquiries in sentencing matters that extend beyond the evidence formally introduced during trial.[133] The state also maintains that the district court erred in concluding that the information learned by the trial court was used in sentencing Blanco to death; this information was used only in the court's sentencing on the armed burglary conviction. The state notes that this court should not presume that the same information was considered *sub silentio* by the trial judge in sentencing, as judges routinely hear inadmissible evidence they are presumed to ignore when making decisions.[134]

---

**128.** *Washington,* 466 U.S. at 695, 104 S.Ct. at 2069.

**129.** *Blanco v. Dugger,* 691 F.Supp. at 330 n. 17; *see also id.* at 331 ("At various times, without prodding, defense counsel volunteered information for no apparent reason, and which could have no effect but to prejudice the outcome of Blanco's sentencing." (citation omitted)).

**130.** *See, e.g.,* trial transcript, at 1643 (statement by trial court: "Well, at this time then I'm going to find that substantial efforts have been made to reach these people. It seems to me that none of these people, including his own brother, wishes to cooperate with him, and it seems like

nobody wants anything to do with supporting him in his defense.").

**131.** *Id.,* at 2021 (trial court's findings in support of armed robbery sentence).

**132.** *Blanco v. Dugger,* 691 F.Supp. at 330 (citation omitted; emphasis in original).

**133.** *Johnson v. Wainwright,* 778 F.2d 623, 632–33 (11th Cir.1985) (demeanor may be considered by judge in capital sentencing), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).

**134.** *See, e.g., Harris v. Rivera,* 454 U.S. 339, 347, 102 S.Ct. 460, 465, 70 L.Ed.2d 530 (1981).

We find that the trial court's statements indicate that the trial court considered Blanco's responses to the court's questions to be quite aggravating and that, regardless of whether the trial court could have put the sentiments out of mind as not in evidence, it in fact did not.[135] It is true that the trial court's statements as to Blanco's lack of remorse were made in the course of the trial court's pronouncement of Blanco's sentence for armed robbery. However, the armed robbery sentence was pronounced concurrently with Blanco's death sentence, which indicates that these sentiments likely factored into the trial court's balancing of the aggravating and mitigating factors. And other disparaging statements by the trial court—to the effect that it was clear Blanco did not know anyone who thought enough of him to come to court—were made during the course of Blanco's death sentencing proceedings. Given the lengthy controversy that occurred as the result of the trial court's inquiry into which witnesses Blanco would call, it would have been nearly impossible for the trial court not to have considered the lack of witnesses adversely to Blanco.[136] Because the revelations were so prejudicial, there is a reasonable probability that the trial court would have weighed the aggravating and mitigating circumstances differently.

It is also clear that Blanco was prejudiced by counsels' failure to put on any mitigating evidence during the penalty phase. The jury recommended a death sentence by a vote of eight to four. As in *Armstrong v. Dugger*,[137] evidence was available concerning Blanco's impoverished childhood, epileptic seizures, and organic brain damage. As in *Armstrong*, "[t]he demonstrated availability of undiscovered mitigating evidence clearly met the prejudice requirement."[138] Moreover, the lack of mitigation witnesses was brought to the jury's attention during the sentencing phase when the court announced that the trial would be recessed to allow Blanco to procure additional witnesses.[139] When the jury returned following the continuance and no witnesses were produced, the jury easily could have concluded that the defense attorneys could discover nothing positive or mitigating in Blanco's background. Given that some members of Blanco's jury were inclined to mercy even without having been presented with any mitigating evidence and that a great deal of mitigating evidence was available to Blanco's attorneys had they more thoroughly investigated, we find that there was a reasonable probability that Blanco's jury might have recommended a life sentence absent the errors.

### 4. Conclusion

Counsels' less than vigilant approach to the protection of their client's confidences and the haphazard and desultory efforts made by counsel to secure mitigation evidence resulted in representation that fell below any objective standard of reasonableness. This combination of attorney errors leads us to conclude that Blanco was severely prejudiced during the penalty phase of his trial and is due a new sentencing proceeding.

---

**135.** *See, e.g., Proffitt v. Wainwright*, 685 F.2d 1227, 1255 (11th Cir.1982) (rejecting trial judge's testimony that he made no use of psychiatrist's report that was admitted without affording defendant opportunity for cross-examination), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983).

**136.** *See Douglas v. Wainwright*, 714 F.2d at 1557 ("[A] vital difference exists between not producing any mitigating evidence and emphasizing to the ultimate sentencer that the defendant is a bad person or that there is no mitigating evidence.").

**137.** 833 F.2d 1430 (11th Cir.1987).

**138.** *Id.* at 1434 (citation omitted); *see also, e.g., Cunningham v. Zant*, 928 F.2d 1006, 1019 (11th

Cir.1991) (finding prejudice where little evidence of skull fracture and no evidence of mental retardation, socioeconomic background, or work or community reputation was presented); *Harris*, 874 F.2d at 763–64 (finding prejudice due to failure to investigate and present mitigating evidence); *Middleton*, 849 F.2d at 495 (finding prejudice due to failure to present mental health mitigating evidence).

**139.** *See* trial transcript, at 1759 ("[I]t's been indicated to me that there may be some evidence that the defense wishes to present in connection with that second phase in the proceedings involving some people who might not be available at this minute....").

## IV. FEDERAL EVIDENTIARY HEARING

■ The state argues that the district court violated principles of comity when it decided to hold an evidentiary hearing on Blanco's claims. The state claims that Blanco's state post-conviction relief hearing was sufficient, as Blanco presented a total of eleven witnesses. Also, twelve of the fifteen claims before the state habeas court were also before the federal habeas court. The state relies on *Townsend v. Sain*[140] for the proposition that Blanco had to demonstrate the existence of one of *Townsend*'s enumerated factors prior to the granting of an evidentiary hearing by a federal court.

28 U.S.C. § 2254(d) subsequently codified the *Townsend* criteria.[141] This court has discussed the relationship between *Townsend* and the statute: *"Townsend* was not ... completely superseded by the amendment [to 28 U.S.C. § 2254(d) ], for the Supreme Court decided when a federal evidentiary hearing is mandatory while the habeas corpus statute, as amended, merely establishes a presumption that the state court judgment is correct unless the applicant establishes one of a number of specific reasons to disregard it." [142]

The *Townsend* test thus only refers to situations where the district court is *required* to hold an evidentiary hearing. *Townsend* itself states, "The purpose of the test is to indicate the situations in which the holding of an evidentiary hearing is mandatory. In all other cases where the material facts are in dispute, the holding of such a hearing is in the discretion of the district judge.... In every case he has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim." [143]

*Townsend* does not limit the discretion of a district court to hold an evidentiary hearing.

In this case, the district court determined that further evidence needed to be taken on Blanco's claims that his counsel were ineffective for failing to subpoena witnesses requested by Blanco, that his counsel were ineffective for failing to ensure the presence of an interpreter throughout the trial proceedings, and that his counsel were ineffective for failing to determine whether he was competent to stand trial.[144] The district court properly exercised its discretion by choosing to hear evidence only on certain of Blanco's claims, and we refuse to disturb that exercise of discretion.[145]

## V. INEFFECTIVENESS AND COMPETENCY TO STAND TRIAL

Blanco argues that he was mentally incompetent to stand trial, as he suffered from organic brain damage, mental illness, a foreign cultural background, and language difficulties. Blanco asserts that, despite indications of this incompetence during trial, counsel failed to conduct any inquiry into Blanco's background and were therefore ineffective. Blanco cites *Futch v. Dugger*[146] for its holding that

counsel could have been ineffective either by failing to make reasonable investigation into petitioner's competency or by failing to make a reasonable decision that such investigation was unnecessary. In order to demonstrate prejudice from counsel's failure to investigate his competency, petitioner has to show that there exists "at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent to stand trial." [147]

---

**140.** 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

**141.** *See Guice v. Fortenberry,* 661 F.2d 496, 500 (5th Cir.1981) (en banc).

**142.** *Id.* at 501 (footnote and citation omitted).

**143.** *Townsend,* 372 U.S. at 318, 83 S.Ct. at 760.

**144.** R6–42.

**145.** *See also In re Wainwright,* 678 F.2d 951, 952–53 (11th Cir.1982) (district court may hold evidentiary hearing to determine whether to apply presumption of correctness under 28 U.S.C. § 2254(d) to state court proceedings).

**146.** 874 F.2d 1483, 1486–87 (11th Cir.1989).

**147.** *Id.* at 1487 (citations omitted).

Blanco acknowledges that this standard requires "concrete examples suggesting that at the time of trial he did not have the ability to consult with his lawyer or that he did not understand the proceedings against him." [148] Blanco argues that he in fact provided ample evidence to the district court showing that counsel should have made an investigation into his competence.

While as discussed previously Blanco did exhibit signs during trial that he might have had some mental health problems, and while Blanco's attorneys may have been deficient in not seeking an examination for sentencing purposes, we are confident that Blanco was not prejudiced by his attorneys' failure to seek a competency examination. The district court (and the state courts) found no factual basis to support a claim of incompetency at the time of trial. The district court did not find believable Blanco's witnesses who testified as to his incompetence. The district court also concluded from the trial transcript that Blanco was competent, understood the proceedings, and could consult with counsel, due to the discussions between Blanco and the trial court and counsel.[149] Blanco has accordingly shown no prejudice, and his claim that his attorneys were ineffective in failing to seek a competency determination must fail.

## VI. LACK OF INTERPRETATION/ABSENCE FROM PROCEEDINGS

Blanco argues that proceedings were conducted without an interpreter during certain stages of the trial and that Blanco himself was allowed to be absent from certain stages in the proceedings. Blanco spoke very little English, and requested that the trial court appoint a translator, which it did. He was also assisted at trial by attorney Rodriguez, who spoke Spanish.

Blanco further alleges his attorneys were ineffective for failing to guarantee an interpreter and his presence during all stages of the trial.

The district court noted that the substance of these related claims were found to be procedurally barred by the Florida Supreme Court. However, the district court also found that the claims were without merit.[150] On appeal, the state presses its argument that this entire claim is procedurally barred. The state is correct that Blanco only presented one substantive aspect of these claims in his state court direct appeal: Blanco argued that the trial court erred in making factual findings in his absence.[151] On Blanco's appeal of the denial of his motion for post-conviction relief, the Florida Supreme Court found that Blanco's "attempts to expand the claim by arguing that he did not receive a simultaneous translation of all proceedings and was not present at bench conferences held outside the hearing of the jury" [152] were procedurally barred because of the failure to raise the expanded claim on direct appeal. Accordingly, only Blanco's claim that the trial court erred by making factual findings in his absence is not barred. This incident occurred outside of the presence of the jury and related to the trial court's legal ruling on one of Blanco's pretrial motions. We find no merit in this claim and agree with the Florida Supreme Court and the district court that the trial court's actions in Blanco's absence did not occur during a "critical stage[ ] of the trial proceedings." [153]

As to Blanco's additional claim that his attorneys were ineffective for failing to ensure his presence and that of an interpreter during several proceedings, we

---

**148.** *Alexander v. Dugger,* 841 F.2d 371, 375 (11th Cir.1988).

**149.** *See Blanco v. Dugger,* 691 F.Supp. at 324–25.

**150.** *Id.* at 323–24.

**151.** *See Blanco v. State,* 452 So.2d at 523–24 ("Appellant next argues that the trial court erred in making statements on the record in appellant's absence to explain a ruling it had made on the legality of appellant's arrest.").

**152.** *Blanco v. Wainwright,* 507 So.2d at 1380.

**153.** *United States v. Vasquez,* 732 F.2d 846, 849 (11th Cir.1984); *see United States v. Gradsky,* 434 F.2d 880 (5th Cir.1970) (right to preserve does not extend to evidentiary hearing on suppression motion), *cert. denied,* 409 U.S. 894, 93 S.Ct. 203, 34 L.Ed.2d 151 (1972).

note only that Blanco has not been able to demonstrate any likelihood that he would not have been convicted had his attorneys secured his presence and that of an interpreter during trial. Blanco therefore has demonstrated no prejudice.

## VII. SUGGESTIVENESS OF PRETRIAL IDENTIFICATIONS

 Two eyewitness identifications are at issue in Blanco's appeal: that of Thalia Vezos, the niece of the victim, and that of George Abdeni, a neighbor who observed the murderer leaving the scene of the crime. This circuit has established a two-step test in determining whether identification procedures are constitutional. The first step is to determine whether the procedures used were unduly suggestive.[154] If so, the second step is to determine whether, under the totality of the circumstances, the identification was reliable.[155] The factors that go into this "totality of the circumstances" test include: the opportunity to view, the degree of attention, the accuracy of the description, the level of certainty, and the length of time elapsing between the crime and the identification.[156]

### A. Thalia Vezos

 Blanco argues that the circumstances surrounding Thalia Vezos' identification of Blanco were impermissibly suggestive. Immediately after the shooting, Vezos gave a statement in which she told police that she did not recall that the murderer had any facial hair. The next day at the police station, the police told her to read her previous statement, then showed her a lineup where everyone but Blanco had noticeable facial hair. Also, Blanco was older and heavier than the other members of the lineup and was dressed strangely. Vezos then picked out Blanco.

The district court determined that "Blanco's appearance was in no manner substantially distinguishable from the others [in the lineup so as] to render the procedure impermissibly suggestive."[157] But even assuming *arguendo* that the lineup was in fact suggestive, it is clear that Vezos' identification was reliable under the totality of the circumstances. Vezos had an excellent opportunity to view the accused because she was in the presence of the intruder for ten minutes. Also, there was a light on in her room and the hallway. Vezos exhibited a high level of certainty in her identification, as she pointed out Blanco the instant he walked into the lineup room; the police officer accompanying her had to instruct her to wait until she had seen all the men before making a positive identification. Finally, the length of time between the crime and the identification was brief: The lineup identification occurred the day after the crime. We also note that Vezos was extensively cross-examined concerning discrepancies between her statement to the police and her identification, and the jury was able to weigh these discrepancies in reaching its verdict. The lineup identification was sufficiently reliable to be admissible.

### B. George Abdeni

 Blanco argues that the "show up" identification made by witness Abdeni was impermissibly suggestive and unreliable. Abdeni, a neighbor of the victim, told police he had seen a figure—he was not certain if it was a man or a woman—dressed in a "grayish" jogging suit in front of the victim's house immediately after the murder. Abdeni was not able to see the upper portion of the figure, due to some tree branches. Following Blanco's arrest shortly after the murder, Blanco was brought back in order for Abdeni to identify him. Abdeni immediately told police that this was the

**154.** *See Dobbs v. Kemp,* 790 F.2d 1499, 1506 (11th Cir.1986), *modified in part on other grounds,* 809 F.2d 750 (11th Cir.), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987).

**155.** *See Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *see also Cikora v. Dugger,* 840 F.2d 893, 895 (11th Cir. 1988).

**156.** *Biggers,* 409 U.S. at 199, 93 S.Ct. at 382.

**157.** *Blanco v. Dugger,* 691 F.Supp. at 312; *cf. Cikora,* 840 F.2d at 897 (finding no impermissible suggestiveness in lineup procedure in which appellant's facial hair was more sparse than most of the other participants').

person he had seen in front of the house. The district court found that the identification was sufficiently reliable under the totality of the circumstances. Blanco now argues that Abdeni's initial statements to the police were so vague that the subsequent "show up" identification was invalid.

This court has written,

Although show-ups are widely condemned, immediate confrontations allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons. Therefore, show-ups are not unnecessarily suggestive unless the police aggravate the suggestiveness of the confrontation.[158]

In this case, Blanco was simply presented to Abdeni. The police did not aggravate the suggestiveness of the encounter. While Abdeni's identification was certainly less reliable than that of Vezos' identification, it does possess the attribute of having been made quite soon after the initial sighting. Also, defense counsel fully pointed out to the jury the various problems with Abdeni's identification.

If this were the only evidence of Blanco's guilt, it would not be sufficient to support the conviction. However, the other evidence introduced at trial, particularly Thalia Vezos' identification, made Abdeni's identification cumulative. The error here, if any, was harmless beyond a reasonable doubt. We do not find that the district court erred in refusing relief on this issue.

## VIII. ADMISSION OF STATEMENTS

When Blanco was first arrested, he was interrogated without being given warnings pursuant to *Miranda v. Arizona.*[159] He was transferred to the police station, where he refused to answer questions without an attorney. After several hours, he made

further statements to the police. The trial court suppressed the statements given to the police on *Miranda* grounds. However, the trial court made a determination that the statements were voluntary. At trial, the state impeached Blanco's testimony with these statements. The statements involved were that (1) Blanco told the police officer who stopped him that he had been riding a bicycle and running for thirty or forty miles, and that was why he was in the area; and (2) Blanco stated that his identification papers were at his apartment when the police questioned him as to their whereabouts.[160] The first statement was used to impeach Blanco's credibility after he testified at trial; the state contended during closing argument that it was unbelievable that Blanco could have exercised that much, particularly without working up a sweat (Blanco was not sweating when arrested).[161] The second statement was used to highlight the fact that, although Blanco during trial claimed to have lost his identification papers, he originally claimed to have left his identification papers at home.

Blanco argues that his statements were not voluntary; therefore, the state should not have been allowed to introduce his statements for impeachment purposes.[162] For evidence of this involuntariness, Blanco points to the failure to give warnings pursuant to *Miranda* and the failure to provide an attorney. In making this argument, Blanco seems to conflate the voluntariness prong of *Miranda* analysis with the "knowing and intelligent" prong. To determine whether a confession was voluntary, courts focus upon suspects' motives for confessing. To determine whether a confession was given following a knowing and intelligent waiver of fifth amendment rights, courts focus on suspects' comprehension of their rights.[163]

158. *Johnson v. Dugger,* 817 F.2d 726, 729 (11th Cir.1987) (citations omitted).

159. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

160. *See* trial transcript, at 1652–53.

161. *See id.* at 1683–84.

162. *See Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978).

163. *See generally Smith v. Zant,* 887 F.2d 1407, 1428 (11th Cir.1989) (en banc) (Kravitch, J., concurring in part and dissenting in part) ("The 'voluntariness' inquiry is concerned solely with the defendant's motive in waiving his *Miranda* rights. The 'knowing and intelligent' inquiry, on the other hand, does not look to the defen-

The failure by the police to read Blanco his *Miranda* rights or to provide access to an attorney goes to Blanco's comprehension of his rights, not to his motive in confessing. Blanco also argues that his difficulty in communicating with the interrogating officers and his general bewilderment demonstrate involuntariness. We disagree.

Blanco has not alleged any sort of physical compulsion or other overbearance of his will.[164] The district court independently evaluated the state court record[165] and found that Blanco's statements were voluntary.[166] We agree with the district court's conclusions.[167]

Blanco also argues that the trustworthiness of his statements is called into question by the fact that the officer who interrogated Blanco had very limited Spanish-speaking ability, and thus the translation of Blanco's statements was questionable. The Supreme Court has held that statements taken in violation of *Miranda* may be used to impeach a defendant's credibility if their "trustworthiness ... satisfies legal standards."[168] The translating officer's interpretation of Blanco's statements was trustworthy; the officer was born in Cuba, spoke Spanish every day at home, and took high school courses in Spanish.[169]

We do not find that Blanco's statements were improperly admitted to impeach his testimony. Moreover, any error

was harmless beyond a reasonable doubt, because Blanco's statements did not directly reflect his guilt but merely operated to weaken his already flimsy guilt phase defense.

## IX. SUFFICIENCY OF THE EVIDENCE

Blanco asserts that the evidence presented at trial was insufficient to convict him of premeditated murder. Blanco construes the evidence as showing only that the victim startled Blanco during the attempted robbery, a fight ensued, and the victim was shot without premeditation. Given the facts of the crime as set out above and the Florida courts' definition of premeditation,[170] we find that this contention is meritless.

## X. CONCLUSION

The district court properly refused to grant habeas corpus relief to Omar Blanco on his conviction for murder. The district court was correct to grant the writ as to Blanco's death sentencing proceedings, due to the ineffectiveness of his attorneys. We have not considered any other sentencing phase issues raised by this case. The district court is AFFIRMED.

---

dant's motive, nor does it consider *post hoc* the efficacy of the waiver; instead, the 'knowing and intelligent' inquiry focuses solely on whether the suspect understands what he is doing.").

**164.** *See, e.g., Colorado v. Spring,* 479 U.S. 564, 573–74, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) ("Absent evidence that Spring's 'will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct, his waiver of his Fifth Amendment privilege was voluntary under this Court's decision in *Miranda*." (citations omitted)).

**165.** Blanco argues that the district court improperly employed a "clearly erroneous" standard of review of the state court's finding of voluntariness. Federal courts are not bound by state court determinations of voluntariness and are under an obligation to make an independent review of the record. *See Mincey v. Arizona,* 437 U.S. at 398, 98 S.Ct. at 2416. Despite the district court's mistaken statement as to the

standard of review, we are satisfied that the district court in fact conducted an independent review of the record. *See Blanco v. Dugger,* 691 F.Supp. at 320–31 (discussing facts surrounding taking of Blanco's statements).

**166.** *See Blanco v. Dugger,* 691 F.Supp. at 320–21.

**167.** *See Oregon v. Hass,* 420 U.S. 714, 722–23, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570 (1975) ("[T]he pressure on [Hass] was no greater than that on any person in like custody or under inquiry by any investigating officer.").

**168.** *Harris v. New York,* 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971).

**169.** Trial transcript, at 1651.

**170.** *See Sireci v. State,* 399 So.2d 964, 967 (Fla. 1981) (defining premeditation), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982).